**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | | |
|---|---|---|
| LYSTN, LLC d/b/a ANSWERS™ PET FOOD, | : | |
|     Plaintiff, | : | Civ. No. 19-cv-1943 |
| | : | |
| v. | : | |
| | : | |
| FOOD AND DRUG ADMINISTRATION, et al., | : | |
|     Defendants. | : | |

**MOTION FOR RECONSIDERATION PURSUANT TO F.R.C.P. 59(e)**

*Introduction*

AND NOW COMES Plaintiff, asking this Court to reconsider its Order and Determination(s) of January 16, 2020 (Doc. No. 121) that allegations of "final agency action" were conclusory[1] in the face of an outlined detailed scheme, backed by supporting documentation that the Court failed to consider and denied leave to amend to include. Additionally, unbeknown to Plaintiff, on October 9, 2019 – the next day after Plaintiff filed its replies in opposition to Defendants various motions to dismiss, President Trump issued Executive Order 13891 -- Promoting the Rule of Law Through Improved Agency Guidance (Exhibit B), and Executive Order 13892- Promoting the Rule of Law Through Transparency and Fairness in Civil Administrative Enforcement and Adjudication (Exhibit C). The federal defendants herein plainly received notice

---

[1] Plaintiff –vis-à-vis the Declaration of Joseph A. O'Keefe, introduced several documents – including state court deposition testimony, which palpably support each and every notice pled averment. With opportunity to amend, Plaintiff could easily plead said evidence specifically including, but not limited to, introduction of a plethora documents that are directly admissible into the record and/or at trial. See, Exhibit A hereto –Declaration of Joseph A. O'Keefe, incorporated herein as thought set for the in complete detail below. "A denial of leave to amend to repair a jurisdictional defect, even on futility grounds, does not call for a dismissal with prejudice . . . The district court extended the futility principle too far in this case by dismissing with prejudice for lack of standing, since it lacked jurisdiction to make a determination on the merits of the complaint." *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006).

1

of the President's Order and of its contents but failed to bring such to the attention of the Court or Plaintiff despite it affirming that which they specifically denied – the use of "non-binding" guidance policies to create shadow regulations that are, by any definition or test, final agency action.[2]

Recognizing the EXACT form of shadow regulation Plaintiff has been the subject of – as outlined within its complaint and papers in opposition to Defendants' various motions to dismiss, President Trump *ordered* executive agencies to comply with constitutional and statutory law relative to rule making, to afford consumers and industry equal access to judicial review of their purported "non-binding" policies that – using the federal purse, they enforce through various means such as the Animal Feed Regulatory Program at issue herein.

***Predicate Background***

On or about July 5, 2019, Plaintiff instituted this suit averring, in essence, that the Food and Drug Administration ("FDA") was impermissibly circumventing Constitutional and statutory law through AAFCO and its several member states by enacting (and enforcing) shadow regulations therewith.  AAFCO "partnered" with the FDA to develop the Animal Feed Regulatory Program Standards ("AFRPS") program and has acted at the behest of the FDA to enforce the FDA's purported non-binding guidance policy specifically through the AFRPS' zero-tolerance policy in Colorado and nationwide. On January 16, 2020, this Court DISMISSED with prejudice Plaintiff's Complaint on jurisdictional grounds because Plaintiff had not shown final agency action that would be subject to judicial review. Contrary to the Court's decision, beginning in 2015

---

[2] Contemporaneous and subsequent understandings of a statutory scheme (including understandings by President and Department of Justice) may sometimes be admissible to interpret a statute. *See generally Hagen v. Utah*, 114 S. Ct. 958, 969 (1994); *Darby v. Cisneros*, 113 S. Ct. 2539, 2545-47 (1993)

2

Defendants took enforcement actions against Plaintiff using food additive violations as the "cause" of distributing adulterated food and claiming Plaintiff was in violation of the FD&C Act because of not meeting the zero-tolerance policy that supposedly is non-binding.[3]

### *Identification of Final Agency Action*

AAFCO is the organization that serves as the FDA's explicit "partner" in developing the AFRPS, and it is the AFRPS that forms the enterprise of conspiracy and the complaint tells this story adequately.  While the Court – without leave to amend, has determined Plaintiff's averments to be conclusory and not entitled to the presumption of truth, it fails to consider the numerous documents that Plaintiff has provided which demonstrate, unquestionably, their actual truth.[4] Through various means, including providing significant block grants to AAFCO's member states and requiring those states that receive that money under the AFRPS program to have state regulatory regimes that are "equivalent in effect" to the federal regulatory regime, the FDA controls AAFCO and uses this quasi-governmental organization to ensure it adopts the FDA's guidance in their model laws, the FDA's desired definitions, and to organize the enforcement of the shadow regulation scheme through the participating states.  The FDA first began enforcement of AFRPS as against Plaintiff in 2015[5] after AAFCO's member state answered the FDA's call to pull and sample its products. (Exhibit A, Doc. No. C -G, 1D-X, 4A-E)  As relevant herein, the State of Colorado, the Colorado Department of Agriculture ("CDA") at the behest of the FDA and

---

[3] Plaintiff points the Court to its detailed allegations of "shadow regulation" through the Association of American Feed Control Officials ("AAFCO") within its complaint and opposition papers, as well as a trove of self-authenticating documents (Exhibit A) properly considered by the Court, and asks it to reconsider its determination.

[4] The Court denied amendment and also discovery due to Plaintiff submitting over 2,600 pages of documentation.  Plaintiff respectfully argues the Court should consider the evidence contained within these documents.

[5] This 2015 matter remains open and all events subsequent (including the Colorado prosecution) flow therefrom and are part and parcel of it and the FDA's AFRPS.

pursuant to mandatory terms that came with large payments from the FDA, specifically targeted Plaintiff's product for sampling as part of an FDA's "quota" targeting natural pet food. (Exhibit A, Doc. No. F, G, H). So too, Nebraska – specifically referencing AFRPS, pulled Plaintiff's product for sampling. At the same time states -including Pennsylvania, which like Colorado has state personnel making decisions on AAFCO's board, have similarly "worked cooperatively" to be "on the same page" specifically targeting Plaintiff and other natural pet food companies for enforcement under AFRPS and its standards that are required to be the "functional equivalent" of the FDA's non-binding guidance policies. (Exhibit A, Doc. No. X, 1JJ, 4F, 6T, 6X)[6]

AAFCO publicly touts that it is participating as a "partner" in the Federal process of bringing Colorado animal feed regulations and enforcement into being "equivalent in effect" to the Federal regulations. Its member states, including Colorado, receive large sums of money to enforce the Animal Feed Regulatory Program Standards. The testimony of the CDA's Kristi McCallum was precise and plain. She explains that the FDA is their "customer" and all sampling, testing, and reporting is done according to the AFRPS's terms, specifically terms that AAFCO touts it "partnered" with the FDA in developing and instituting. This is admitted by the FDA in their RFA-FD-19-021 where it says:

> "[i]n 2011, FDA and AAFCO entered into a partnership to develop the AFRPS . . . [with the] fundamental goal of AAFCO and FDA to provide a mechanism for developing and implementing uniform and equitable regulations, and standards to enhance the protection of the nation's animal food supply."

*See,* Exhibit N to the Declaration of Joseph A. O'Keefe -- RFA-FD-19-021.

O'Keefe Dec. Exhibit C is MOU 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. Contained therein, the FDA and AAFCO

---

[6] See, Exhibit 6J – July 20, 2018 Phone Call Between CDA, PDA and CVM of the FDA; December 4, 2018 re: December 7, 2018 WebEx Meeting and Exhibit 6K – August 6, 2018 – FDA Sean Duke and Others, Size of Company; EIR from Lystn; Contract Manufacturer; Lystn's Other Products; Lystn's FEI #; PDA Accompanying FDA and Samplings.

4

(which exists only through its participating member states – Colorado included[7]), outlines:

> "The purpose of AAFCO is to provide a mechanism for developing and implementing uniform and equitable laws, regulations, standards, definitions, and enforcement of policies for the manufacturing, labeling, and sale of animal feeds and ingredients. AAFCO provides 'model laws' and regulations that nearly all states have adopted as their basis for their feed-control program. It is governed by officers and a board of directors … elected by the membership at the annual meeting of AAFCO."

(O'Keefe Dec. Exhibit C, pgs. 8-9)

In fact, AAFCO's role in regulation of pet food and animal feed is so prevalent that for Fiscal Year 2017 alone its tax return shows (O'Keefe Dec. Exhibit R) – besides a net worth of $1,800,000.00, $139,000.00 in income from administering the FDA's Animal Feed Regulatory Program ( see, O'Keefe Dec. Exhibit R (Supplemental Income O ("Feed Program") block grants), see also Exhibit V (Pa. Taxpayers reimbursing for AAFCO related matters). The AFRPS program was developed by the FDA, through AAFCO and its participating member states – including Colorado.[8] And in the FDA's own words:

> "The AFRPS Cooperative Agreement will provide funding for State feed regulatory programs that maintain an FDA feed safety inspection contract to develop and implement the standards; develop and maintain best practices; enhance feed safety; and better direct their regulatory activities at reducing food borne illness …. In addition, this cooperative agreement will provide options of funding for laboratories that support animal feed programs …."

(See, Exhibit C, F, N, hereto, a true and correct copy of the FDA's outline of the program obtained from AAFCO's website - -a document which identifies Colorado – along with the other AAFCO member states, as one of 22 sharing over $11,000,000.00 worth of federal monies to enforce the Zero Tolerance Standard, see also, Exhibit B hereto – the FDA Fact Sheet for same). In fact,

---

[7] For example, O'Keefe Dec. Exhibit M outlines AAFCO's Board of Directors is made up of Feed Control Officers from its participating member states, including Hollis Glenn – Director of the Inspection and Consumer Services Division at CDA.

[8] For example, the CDA's Hollis Glenn serves as an AAFCO Director.

AAFCO *itself* touts development and enforcement of the AFRPS as a "partnership" between it, its member states, and the FDA:

> In 2011, the FDA and [AAFCO] partnered to develop the [AFRPS]. The feed standards establish a uniform foundation for the design and management of states' programs responsible for the regulation of animal feed. Through implementing the feed standards, a state's program will be better able to achieve and maintain programmatic improvements that help ensure the safety and integrity of the U.S. animal feed supply. A state's implementation of the feed standards also helps to insure a uniform and consistent approach to feed regulation among jurisdictions. The goal of the standards is to leverage resources and share common successes to build systems within state regulatory feed programs.

(See, Exhibit 3J – AAFCO's self-description of the subject program).

And, labeling its zero-tolerance policy as "nonbinding guidance" has no effect on whether or not that guidance is Final Agency Action reviewable under the APA[9]. *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000). "If an agency acts as if a document issued at headquarters is controlling in the field, if it treats the document in the same manner as it treats a legislative rule, if it bases enforcement actions on the policies or interpretations formulated in the document . . . then the agency's document is for all practical purposes binding." *Id.* at 1021. In *Bennett v. Spear,* the United States Supreme Court summarized the finality standard in two prongs:

i. Under § 704 of the APA, does the action mark the end, or consummation of the agency's decision-making process?
ii. Does the action determine the rights or obligations of the regulated or from which legal consequences will flow?

*Bennett v. Spear,* 520 U.S. 154, 178 (1997). If both elements are satisfied, then there is Final Agency Action[10]. For example, these standards of consummation and obligation, when applied

---

[9] Plaintiff notes that when the FDA published this "non-binding" policy, it did – in fact, send in comment and request for hearing, consideration which was, in fact, denied. On that basis alone the AFRPS is subject to judicial review as there is no other way to challenge its legality and defend against it.

[10] Pursuant to Presidential Orders (Exhibits B and C hereto), Defendants -the FDA especially, are now required to correct material assertions to the Court by acknowledging the AFRPS as the Final Agency Action that it is, acceding to this Court's review thereof.

6

to the FDA's 2016 Warning Letter issued to Plaintiff due to the 2015 sampling and testing by the CDA, illustrate that Warning letters can and should be interpreted to be final agency action. After 5 years with no right to a hearing or any redress from the agency that issued the 2016 Warning Letter and after agency notice and publication to the American and International public, the Plaintiff's rights have been denied and their name and product harmed. Harm from which legal consequences properly flow.[11]

### *Consummation*

Warning Letters – like the one Plaintiff received in 2016 that kicked off all of this, are final action undertaken by the agency to induce compliance. Indeed, in passing 21 U.S.C. § 336, Congress passed legislation that by its own language makes a written notice or warning an action sufficient for enforcement against certain violations.[12] Courts that reason Warning Letters only seek to "enjoin a possible future FDA enforcement action" fail to recognize the operation of Warning Letters in the FDA's overall enforcement scheme.[13] While Warning Letters are not the "consummation" of the FDA's formal enforcement action, they are the consummation of the decision to enact informal enforcement against a regulated party.[14]

---

[11] Just this week Lystn had a meeting with a chain of nearly 200 stores that will not carry and sell its poultry products due to the 2016 Warning Letter. The retail store chain says ANSWERS™ has not taken corrective action per the warning letter and therefore even though this only addressed a specific lot 5 years ago in 2015, they refuse to sell Lystn's poultry products because the Warning Letter remains on-line and this matter remains open.

[12] See 21 U.S.C. § 336.

[13] *Cody Labs., Inc. v. Sebelius*, No. 10-CV-00147-ABJ, 2010 U.S. Dist. LEXIS 80118, at *11 (D. Wyo. July 26, 2010); PROCEDURES MANUAL, supra note 13, ch. 4, at 4-2.

[14] *C.f., Gordon v. Norton*, 322 F.3d 1213, 1220 (10th Cir. 2003) (holding that an action is not final because the agency was clear that it had not yet interpreted applicable rules and was still engaged in its decision-making process); RICHARD J. PIERCE, JR., 2 ADMINISTRATIVE LAW TREATISE 1320 (5th ed. 2010).

### *Obligations and Lack of Rights*

In determining the obligation that an agency action has upon a regulated party, the Supreme Court has looked to the language used by agencies. In *Bell v. New Jersey*, the Court concluded that the Department of Education established deficiencies owed, the language used in establishing the deficiency, was sufficiently "definitive" to render the order final as defined by § 704 of the APA.[15] In doing so, the Court adopted the "flexible" and "pragmatic" requirements of *Abbott Labs v. Secretary of Health, Education and Welfare*.[16] From a formalistic perspective, an FDA Warning Letter imposes no binding legal obligations on the recipient.[17] Parties are able to disregard the directives contained in a Warning Letter and challenge "any adverse FDA action in [a formal] enforcement hearing."[18] But, by ignoring Warning Letters, regulated parties risk "arous[ing] the ire of such a powerful agency [as the FDA]," in addition to the related hardships that accompany the receipt of a Warning Letter.[19] Significant and consequential, if not legal, obligations are put upon those regulated parties that receive Warning Letters.[20] Beyond risking the ire of the FDA,

---

[15] Id.

[16] *Abbott Labs. v. Gardner*, 387 U.S. 136 (1967); see also Bell, 461 U.S. at 779–80 ("Our cases have interpreted pragmatically the requirement of administrative finality . . . .").

[17] *See, e.g., Wash. Legal Found. v. Kessler*, 880 F. Supp. 26, 35 (D.D.C. 1995). Other courts have found, however, that where an agency issues a letter determining legally defined questions, that letter can constitute final agency action. W. Illinois Home Health Care, Inc. v. Herman, 150 F.3d 659, 663 (7th Cir. 1998) (holding that a letter sent by an Assistant Agency District Director was final and reviewable because it interpreted the meaning of the term "joint employer" as defined in the Fair Labor Standards Act); PIERCE, supra note 134, at 1330.

[18] *Washington Legal Foundation,* 880 F. Supp. at 36. In reality, approximately 93% of those who receive Warning Letters respond to the FDA. State Enforcement Regulation, supra note 8, at 2457.

[19] *Washington Legal Foundation*, 880 F. Supp. at 36.

[20] Even the FDA notes that Warning Letters are not to be taken lightly and expect that a majority of parties will in fact take corrective action upon receipt. Warning Letters Regulation, supra note 8, at 27,026.

regulated parties are vulnerable to lawsuits, loss of sales and investments, and sacrifice of contracting opportunities with the federal government.[21]

### *Error Warranting Reconsideration*

The Court's Order (Doc. No. 121) mistakenly references that "…while plaintiff claims that 'the FDA enlisted the CDA to pull product from the shelves to be tested by [its] state laboratory and slandered the Plaintiff's products,' the example it gives of such action is conduct performed by the state of Nebraska, not the CDA or AAFCO."  This all started with the FDA's 2016 Warning Letter based on Plaintiff's product pulled off the shelf in Colorado in 2015. Thereafter it was a coordinated assault on Plaintiff and its products across several states including the subject 2018 CDA action.  The Court further states that while plaintiff alleges that "[t}he FDA, through the CDA has chosen to prosecute Plaintiff," Plaintiff failed to allege in its complaint any facts supporting its claim that the CDA's state prosecution of plaintiff was at the behest of the FDA or was a condition to the CDA receiving federal funding.  Plaintiff – absolutely, produced the very documents showing that the CDA matter was – unequivocally, pursuant to the AFRP, fully funded by the FDA, and as coordinated through AAFCO and its member states. *See, i.e.* Doc. No. 79-1 and O'Keefe Declaration attached hereto and incorporated herein as though set forth in complete detail below.

---

[21] Plaintiff sufficiently exhausted all required and available adjudication processes with the FDA surrounding the outstanding 2016 Warning Letter matter before seeking judicial review. The Commissioner's final decision to not provide a required Regulatory Hearing for a Statutory provision and/or Regulatory provision constitutes final agency action. Per Section 10.45 (d) Unless otherwise provided, the Commissioner's final decision constitutes final agency action (reviewable in the courts under 5 U.S.C. 701 et seq. and, where appropriate, 28 U.S.C. 2201) … on a matter involving administrative action which is the subject of an opportunity for a hearing under 16.1 (b) of this Chapter.

9

Defendants failed to disclose that Plaintiff's products were sampled, tested and alleged to have been adulterated with Salmonella in 2015 by the CDA under the directive of the June 3, 2015 "CVM Issues Assignment to Collect Official Samples of Raw Foods for Dogs or Cats in Interstate Commerce in the United States and Analyze them for Salmonella, Listeria monocytogenes, Escherichia coli O157:H7 and Non O157:H7 Shiga Toxin-Producing Escherichia coli (STEC)"[22]. When Plaintiff exercised its rights and requested an Administrative Hearing in Colorado, the CDA declined granting the Plaintiff a hearing and referred the matter over to the FDA. The FDA states in the March 17, 2016 Warning Letter, "Because exposure to Salmonella spp. Can cause serious adverse health consequences or death to humans or animals, in July 2013, FDA issued a Compliance Policy Guide (CPG) addressing the presence of Salmonella in Food for Animals, CPG 690.800. Therefore, the above products are adulterated within the meaning of section 402(a)(1) of the Federal Food, Drug and Cosmetic Act (the Act), 21 U.S.C. §342(a)(1)."

At first the FDA wrongfully accused the Plaintiff of adulterating its food using eggs from Iowa, when in fact Plaintiff never purchased or used eggs from Iowa, the FDA then accused Plaintiff of food additive violations as contributing cause to the adulterated Salmonella finding[23]. The FDA then issued a national March 17, 2016 Warning Letter proclaiming the Plaintiff was in violation of food additive and labeling laws and distributing an adulterated product under the FD&C Act due to noncompliance with CPG 690.800.[24] The FDA falsely claimed Plaintiff did not specify what corrective action, if any, Plaintiff intended or proposed to take regarding the products.

---

[22] https://www.fda.gov/animal-veterinary/biological-chemical-and-physical-contaminants-animal-food/cvm-issues-assignment-collect-official-samples-raw-foods-dogs-or-cats-interstate-commerce-united. *See also,* O'Keefe Declaration Exhibit 1D September 3, 2015, Exhibit 1J,1K – September 4, 2015).
[23] *See* O'Keefe Dec. Exhibit 2E – September 24, 2015 – Sean Duke Inconsistencies and Exhibit 2F – September 25, 2015 – FDA Mixed up Samples and Confusion on Serotype)
[24] *See* O'Keefe Dec. Exhibit 1Y March 17, 2016 FDA Warning Letter.

10

Plaintiff responded to the Warning Letter with two April 5, 2016 letters to the FDA. The first provide multiple, detailed explanations of the requested and required corrective action steps taken and the second addressed the targeting of Plaintiff and the inconsistent, biased and deceptive actions by the FDA or at its behest against Plaintiff and its products.[25] It wasn't until a response was received under a FOIA request that FDA disclosed the Collection Reason and Sample Basis: "Surveillance" with FDA Sample Analysis Reports was to follow up positive Salmonella found in frozen raw dog food collected by the Colorado Department of Agriculture, Collecting District identified as DEN-DO.[26]

Plaintiff formally requested, in writing, a formal Notice of Appeal which the FDA refused to grant a hearing.[27] Plaintiff's 2016 request for Appeal (with reference to the 2 April 5, 2016 letters) stated all the same claims contained in its Complaint and was entitled to a hearing as of right under federal law. By issuing the Warning Letter and then ignoring the formal request for an Appeal and not granting the hearing to which Plaintiff was entitled, the FDA has left Plaintiff with no agency relief and no option to seek it which, by definition, constitutes Final Agency Action.[28] The 2018 sampling and testing of Plaintiff's product again for the second time by the CDA is part of the 2015 ongoing open FDA investigation as referenced and communicated by the FDA in

---

[25] Exhibit 2V – April 5, 2016 and April 21, 2016 - Lystn Keith Hill Response to March 17, 2016 FDA WARNING LETTER (Letter 1 of 2) and Exhibit 2W – April 5, 2016 - Lystn Keith Hill Supplemental Letter to March 17, 2016 FDA WARNING LETTER (Letter 2 of 2) and Exhibit 2X – April 21, 2016 - Lystn Keith Hill E-mail Response to March 17, 2016 FDA WARNING LETTER; Lystn Keith Hill April 5, 2016 Letter

[26] See O'Keefe Dec., Exhibit 1BB June 17, 2016 - FDA FOIA Request #2016-4464 Sample 913964 email 1 of 2 and Exhibit 1BB - June 17, 2016 – FDA FOIA Request #2016-4464 Sample 862407 email 2 of 2).

[27] <u>See O'Keefe Declaration</u> Exhibit 2Y - May 17, 2016 - Lystn Keith Hill May 17, 2016 Letter Notice of Appeal in Response to FDA issued WARNING LETTER dated March 17, 2016.

[28] What is important to understand is this matter is still open and the 2015 investigation was never closed by the FDA so they could use AAFCO and its member states to continue their biased, targeted and premediated regulatory case against Plaintiff and avoid disclosure under FOIA.

discussions with the Plaintiff.[29] The Nebraska reference used in Plaintiff's filings was merely to demonstrate how another AAFCO state regulatory agency was following FDA's instructions in testing Plaintiff's products and intentionally making false misrepresentations to the public.[30] In fact, Exhibit 1GG hereto – the FDA's Evelyn Bonnin Response to Lystn Keith Hill December 11, 2018 E-mail, plainly demonstrates the strong ties the FDA has to the several member states, Colorado especially.

### *AFRP is Final Agency Action*

There is no reasonable argument that the FDA has not consummated the decision-making process on *Salmonella* with its guidance when AFRPS requires enforcement of that guidance by participating states. Whether or not such guidance is actually Final Agency Action depends on a "host of factors." *Id*. at 39. But most important of these factors are the following three:

i. whether the agency has taken a definitive legal position regarding its statutory authority;
ii. whether the case presents a purely legal question of statutory interpretation; and
iii. whether the action imposes an immediate and significant practical burden on the regulated entity.

*Id*. (*citing Philip Morris USA Inc. v. United States Food & Drug Administration*, 202 F. Supp. 3d 31, 46 (D.D.C. 2016) (internal punctuation omitted). President Trump's Orders recognize this

---

[29] See O'Keefe Declaration Exhibit 2CC - June 22, 2018 - Lystn Keith Hill E-mail to FDA Robin Rivers with Concerns and Questions Re: Inspections, Communications, Sampling and Testing, Requests for Records, etc. and Exhibit 2NN – January 9, 2019; Exhibit 1GG, 2HH.

[30] See, O'Keefe Declaration Exhibit 4S – January 2, 2019 – Nebraska Data Packet for Salmonella Sample 2019CDM5011 – Positive.pdf; Chain of Custody for Salmonella 2019CDM5011.pdf); Exhibit 1JJ – January 14, 2019 – FDA Allison Hunter E-mail Re: FDA Eric Nelson Response and Web Post to Lystn Letter dated 01142018 Decision Not to Recall Nebraska Lot. The Nebraska Warning Letter also provides evidence that the FDA is knowingly and falsely lying to the public stating, "Federal law requires all pet food to be free of pathogens, including Salmonella." ; Exhibit 1KK – January 14, 2019 – FDA Warning Letter to Pet Owners Not to Feed One Lot of A+ Answers Straight Beef Formula for Dogs Due to Salmonella).

12

well settled law and plainly and specifically call for an end to the charades AND the end of shadow regulatory programs such as the AFRPS.

As for the first factor, the FDA has plainly required AFRPS participating states pass statutes and regulations "equivalent in effect" to its "non-binding" guidance policies, specifically its guidance on *Salmonella*. This means they have taken a definitive legal position that the FD&C Act creates a zero-tolerance standard for *Salmonella* in pet food.

In *Washington Legal Foundation v. Kessler*, Washington Legal Foundation challenged a policy of the FDA limiting the dissemination of information regarding "off-label" uses for drugs and medical devices.[31] In challenging the FDA policy, Washington Legal Foundation alleged that through Warning Letters and other informal agency communications the FDA established an official policy banning the distribution of information on "off-label" uses for drugs and medical devices.[32] The FDA argued that the Warning Letters and policies issued did not constitute final agency action and thus were not ripe for review before the court.[33] The court held that while the Warning Letters may be advisory, it would be unwise to "be blind to the practical effects of these letters and other statements."[34] The court held that "[o]nce the agency 'publicly articulates an unequivocal position . . . and expects regulated entities to . . . conform to that position, the agency has voluntarily relinquished the benefit of postponed judicial review.'"[35]

---

[31] *Wash. Legal Found. v. Kessler*, 880 F. Supp. 26, 27–28 (D.D.C. 1995). "Off-label" use of a drug occurs when a doctor prescribes a medication "in a manner different from that approved by the FDA." Randall S. Stafford, Regulating Off-Label Drug Use — Rethinking the Role of the FDA, 358 NEW ENG. J. MED. 1427, 1427–29 (2008). Off-label prescriptions are common, but pharmaceutical companies may not promote their products for off-label use. Id.
[32] *Wash. Legal Found.*, 880 F. Supp. at 27–30
[33] Id. at 34–35.
[34] Id. at 35.
[35] Id. (citing *Ciba-Geigy Corp. v. EPA,* 801 F.2d 430, 436 (D.C. Cir. 1986)) (first omission in original).

As for the second factor, the *Salmonella* guidance concerns a legal question of statutory interpretation. Can any amount of naturally occurring *Salmonella* render pet food adulterated when the statute requires proof that the quantity of *Salmonella* would ordinarily render the pet food injurious to health? The FD&C Act clearly states that naturally occurring *Salmonella* does not render food adulterated unless it is an additive substance or in quantity that ordinarily would render it injurious to health. Just like *American Academy of Pediatrics* where the FDA determined questions of law (that they did not have to regulate e-cigarettes when the law commanded they do so by a time certain), this case involves the FDA determining a legal question of statutory interpretation, that the FD&C Act allows for a zero-tolerance standard with no quantification necessary where the law actually requires quantification in every circumstance.

As for the third factor, the *Salmonella* guidance burdens the Plaintiff directly because of how the FDA has engaged and continues to engage in this type of shadow regulation. The results of this "non-binding" policy are public health warnings issued by the FDA telling consumers that the Plaintiff's pet food is adulterated and dangerous and a state-level prosecution directed by the FDA, as well as threatened punitive actions including monetary penalties and/or criminal charges. The FDA also falsely notifies the public that the Plaintiff is violating federal law in stating "Federal law requires all pet food to be free of pathogens, including Salmonella." That creates a concrete burden on the Plaintiff to either comply and sacrifice their raw product at the altar of pasteurization or face enforcement action. Simply put, the FDA has taken final agency action and their argument to the contrary does not reflect reality. Plaintiff suffered harm to reputation and monetary damages.

The FDA compels AAFCO Member states to adopt a zero-tolerance *Salmonella* standard, perform inspections and sampling of the Plaintiff's pet food, and if there is any evidence of *Salmonella* presence (without quantification, without conducting a Health Hazard Evaluation,

without regard to serotype, and without considering even if the bacteria are alive) that is then reported to the FDA. Next, the AAFCO member state typically orders a Notice of Alleged Violation and Stop Distribution Order against the Plaintiff (manufacturer/processor), requires notice to the Plaintiff's distributors and retail stores and solicits an admission of guilt and payment of fines by the Plaintiff. Many states also place notice on the federal Reportable Food Registry (RFR). Therefore, the mere labeling of the guidance as "Nonbinding" has no effect on whether or not that guidance is Final Agency Action reviewable under the APA. *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000). "If an agency acts as if a document issued at headquarters is controlling in the field, if it treats the document in the same manner as it treats a legislative rule, if it bases enforcement actions on the policies or interpretations formulated in the document . . . then the agency's action is for all practical purposes binding." *Id*. at 1021; *see also*, Exhibits B and C hereto. The FDA, both by itself and through AAFCO state regulatory members, has decided that there should be a nationwide zero-tolerance standard for *Salmonella* in pet food and use of the AFRP as the nationwide means of enforcement ignoring FD&C Act requirements.

WHEREFORE, Plaintiff requests this Court GRANT Reconsideration of its Order and Determination(s) of January 16, 2020 (Doc. No. 121), allowing Plaintiff to amend its complaint consistent herewith and scheduling a hearing on said Complaint pursuant to the Federal Rules of Civil Procedure.

DATED: February 6, 2020        **Dickson Law Group**
<u>S/ Joseph A. O' Keefe</u>
Joseph A. O'Keefe,
(Co. Bar No.52229)
(Pa. Bar. No. 77068)
**Ryan Gilman**
(Co. Bar No.44179)
Counsel for Plaintiff
605 S. Tejon Street
Colorado Springs, CO 80903

15

## CERTIFICATE OF SERVICE

I hereby certify that on this date a true and correct copy of the foregoing has been electronically filed with the Court's ECF system, is available for downloading, and with electronic service on opposing counsel as follows:

**Kenneth F. Rossman, IV**
**Stacy Kourlis Guillon**
LEWIS ROCA ROTHGERBER CHRISTIE LLP
1200 Seventeenth Street, Suite 3000
Denver, CO 80202-5835
Tel.: 303.623.9000
Email: krossman@lrrc.co
 sguillon@lrrc.com

**Lindsey M. Knapton, Esq.**
Assistant Attorney General Fellow
Colorado Department of Law
Business and Licensing Section
Ralph L. Carr Judicial Building
1300 Broadway, 8th Floor
Denver, CO 80203
(720) 508-6189
Fax: (720) 508-6037
Email: lindsey.knapton@coag.gov

**Charles J. Kooyman, Esq.**
Colorado Senior Assistant Attorney General
**Bill L. Seiber, Esq.**
Colorado First Assistant Attorney General,
Ralph L. Carr Judicial Building
1300 Broadway, 8th Floor,
Denver, Co. 80203
(720) 508-6440
Fax: (720) 508-6037
Email: charles.kooyman@coag.gov

**Meredith Healy, Esq.**
Trial Attorney
Consumer Protection Branch
U.S. Dept. of Justice, Civil Division,
P.O. Box 386,
Washington, D.C. 20044-0386
Email: Meredith.B.Healy@usdoj.gov

Susan Williams, Esq.

16

        Associate Chief Counsel
Food and Drug Administration
10903 New Hampshire Ave.
Silver Spring, Md. 20993-0002
Email: Susan.Williams@fda.hhs.gov

John Dillard, Esq.
Ollson, Frank, Weeda, Terman, Matz, P.C.
2000 Pennsylvania Ave., NW,
Suite 3000,
Washington, DC 20006
Email: jdillard@ofwlaw.com

Dated:  February 6, 2020

/s/ Joseph A. O'Keefe, Esq.
Joseph A. O'Keefe, Esq.